No. 1416.—MARY JANE STINSON, wife of Joseph Stinson, *v.* MRS. V. O. LELIEVRE et al.

Where three lots of ground lying contiguous to each other in the city of New Orleans, designated as lots Nos. 1, 2 and 3, have been specially mortgaged to secure a debt, and it is. shown that lots Nos. 1 and 2, of the series, are incumbered by prior mortgages, and are entirely covered by a building used as a hotel, and that lot No. 3 forms the yard for the hotel, lot No. 3 can not be sold separately from that of Nos. 1 and 2 for the benefit of the mortgage for which all three stand pledged.

APPEAL from Sixth District Court of New Orleans. *Leaumont,* Judge of the Fifth District Court, presiding. *Alexander T. Steele,* for plaintiffs and appellants. *J. Ad. Rozier,* for defendants and appellees.

WYLY, J. The plaintiff purchased from Mrs. Jeter certain lots of ground and improvements, at the corner of Camp and South streets, fronting on Lafayette Square, known as lots one, two and three, the first two being covered by the building called the "Park Hotel," and the third being the yard of that building on which its side windows and doors open.

Mrs. Jeter mortgaged all three of the lots prior to the sale, describing them separately in the act. The defendants foreclosed this mortgage,. *via ordinaria,* and the writ of sale commanded the sheriff to seize and sell the property described in the act. He, however, only seized lot No. 3, and advertised it for sale when the plaintiff enjoined the sale on the ground that at the time of the execution of the mortgage, and ever since the lots were and have been used as one property, to wit: a hotel, and the lot seized could not be sold separately without impairing the value of the property.

The court dissolved the injunction, and gave judgment, *in solido,* against the plaintiff, and her security on the injunction bond, for $1591 65 damages, $250 attorney's fees and costs. The plaintiff and her surety have appealed.

The defendants contend that, as the lots are described separately in the act of mortgage, as the first two are covered by a prior mortgage, and as they originally had separate owners, although contiguous, they are, in fact, separate properties; and that, under their mortgage rendered executory against all three of the lots. it is not irregular and improper to seize and sell lot No. 3, separately from the other two.

The plaintiff, on the other hand, insists that all three of the lots are one property, and that the seizing creditor can not legally sell lot No. 3, the yard of the house, as a detached property, but must sell all or none. The question presented seems to be one of fact.

We find in the record the following admission, to wit: "The building called the Park Hotel covers lots 1 and 2, or the whole of said lots 1 and 2 are under a roof, and they have windows and doors opening on lot No. 3, and have no other yard except lot No. 3." It appears to us that a hotel could not well be conducted without a yard; and as the lot seized is admitted to be the only yard of the building, and that upon which the doors and windows open, it must necessarily be an

injury to detach it from the other lots by selling it in the manner attempted by the defendants.

Under the admissions in the record, we regard all three of the lots as one property, designed for the building and yard of the hotel, and that they can not legally be sold separately under the mortgage of the defendants.

It is therefore ordered that the judgment appealed from be avoided and annulled, and that the defendants be perpetually enjoined from selling the mortgage premises separately and contrary to the writ of sale. It is further ordered that the defendants pay costs of both courts.

Mr. J. Ad. Rozier made the following argument on application for rehearing:

## I.

### LAW OF THE CONTRACT.

Legal agreements having the effects of laws upon the parties, none but the parties can abrogate or modify them. Courts are bound to give them legal effect, according to the true intent of all the parties. C. C. 1940. Absolute ownership gives the right to enjoy and dispose of one's property in the most unlimited manner, provided it is not used in a way prohibited by laws or ordinances. C. C. 483. Individuals have the free disposal of the property which belongs to them, under the restrictions established by law. C. C. 476. The owner has the rights of *usus fructus* and *abusus*. Having the control of them in the most absolute manner, he can alienate it, in part or in whole, he can modify or change completely the form, the destination and the mode of enjoyment, renounce or abandon it; these are attributes so essential to the right of property that he could not renounce that right. Demolombe Distinction des Biens, vol. 1, p. 460.

It would be idle to enter into inquiries as to whether the owner acted judiciously or not, since his control is absolute, including the right to abuse; we must necessarily limit ourselves to the ascertainment of what law the parties have made unto themselves. The evidence of the contract in this cause is to be found in the authentic act of mortgage. Parol evidence can not be admitted against or beyond what is contained in the act. C. C. 2256. We must neither add nor retract, otherwise it would permit parties to set up a verbal mortgage which would infringe the disposition of the Code, "No proof can be admitted of a verbal mortgage," 3272. A written instrument being of the essence of a mortgage. In this case it is pure and simple. Under the division, first, of the act, the lots Nos. one and two are described in the square composed within Girod, Camp, St. Mary street and South street, Lafayette Square, described by Nos. one and two, on a plan drawn by Forstall, with the buildings and servitudes appertaining, known as the Florance House, and under that of second, is described, separately, under the denomination of a certain lot of ground, designated on a plan referred to, having the privilege of using in the rear a corridor three feet wide, opening on Camp street, which is reserved for the use and benefit of the lots one and two and No. 9, on said plan.

The dimensions of each lot is stated to be twenty-five feet by a depth of eighty-seven feet, except lot No. three, depth ninety feet. Observe the word *certain*, which means a specific, determinate, independent

lot from Nos. one and two.   The same word is not used with respect to the other two lots, for the intention was to hold these lots as one entire property, for the evident reason that one house stood on both    Mark, nothing is said in division second about the Florance House.

Had the intent of the contracting parties been to make the three lots one entire thing—a unity—the description would run thus: " A certain lot composed within the square (already named) with eighty-seven feet front on Camp street, and seventy-five front on South street, Lafayette Square," and ninety feet deep on the west side.

The mortgage imposed on lot No. three, by the terms of the act, is pure, simple, absolute—*hoc servabitur, hoc pro cauto habendum est.* The mortgagor is thus irrevocably bound, likewise his heirs and assigns. It is thus that you must always revert to the source and cause of the contract to determine the mode of execution, and that at the time of the formation of the contract, in order to ascertain the extent of the obligation. Proudhon des Personnes, vol. 1, p. 44. The mortgagor after this is no longer free—mutation of right has taken place—the *vinculum juris* is created, at the instant of the signing of the mortgage act. The destination of the things can not be changed—you can not afterwards create a principal, nor change an accessory.   *Nemo potest mutare consilium suum, in alterius damno,* nor create a servitude.

It matters not whether the lot No. three, at the time of the contract, was an accessory of Nos. two and three—there is nothing in the act adverting to this.   No instrument of writing recorded even. alludes to it—verbal testimony is inadmissible—if any ambiguity, the. interpretation is against the stipulating party—*verba intelliguntur contra proferentem, obscuritas, pacti, no cet venditori quia potest integra apertius dicere.*

The lots Nos. one and two were plastered over with enormous mortgages, especially to the Citizens' Bank, 421 shares of the capital stock, for millions (we will give details), and other special mortgages, heavy in amounts, at the time the mortgage was executed by Mrs. Jeter to Widow O. Lelievre & Co. (see act of mortgage), and therefore if the lot No. three was to be tacked on, made indivisible, appurtenant to the other two, a *sine qua non* that the mortgagee should be enjoined from selling unless the three lots should be sold in block, we can readily conceive that Widow Lelievre & Co. would have held on to their money.

In truth and in fact, the mortgagors in this very case did obtain their money by holding out the inducement that the lot No. three, being separate and distinct property from the other two lots, a first special mortgage on lot No. three would present the best security, inasmuch as it would sell better if sold detached from the other property, being more valuable to any one who held the other, and thus she could sell the lot No. three to advantage and get her money promptly and surely.

Merlin, vol. 14, Hypotheque, p. 126, that in these divers cases the hypothecary creditor has a right in law to make sale of the whole or of a portion of the immovable properties mortgaged, and to exact the payment of the totality of his debt, if they be sufficient.

In 3 La. 433, Gaiennie *v.* Questi, "the mortgagor can not complain that only part of the premises were seized, though he might object that this part was more than sufficient to satisfy the debt." A mortgaged square can be sold in lots.   Planche *v.* Gravier, 6 N. 599.

Even if lot No. three, at the time of the mortgage was indispensable for the utility of the hotel, there being no other yard, still the mortgagor had a right to dismember it.   But where is the evidence that the hotel could not be kept without this yard?   On the contrary, we find that the three lots are entitled to the use of an alley or corridor, in common, three feet wide, opening on Camp street (28), and. that lot

No. three is deeper than the others. The corridor was sufficient for the hotel. As to the opening of windows on lot three, it is not recognized by the act of mortgage, and even if it could be shown that the owner had established a use on a particular part of his property in favor of another, still he had a right to mortgage and extinguish any such servitude. The intention to create a servitude for the respective property will not suffice when such intention is not carried into effect. See Gottschalk *v.* De Santos, 12 An. 475. The court says : " Neither was there anything said expressly about this servitude in the mortgage of the three lots, nor in the sheriff's sale to Lanouse when a title was made to him, after they had been sold to satisfy the mortgage, as then the alley way was not expressly mentioned in the mortgage ; unless it is considered an apparent servitude, it was not necessarily one of the dependencies or appendages of the lots, and could not have been mortgaged with them, and consequently was not sold by the sheriff to Lanouse, who could have no greater rights than Lambert, the mortgagor." Ib. 475.

Moreover, it being clear that there was no servitude at the time of the mortgage, the textual provision of the Code, 947, is applicable here : " An estate being mortgaged does not prevent the owner from establishing servitudes on it, saving always to the creditor the right of demanding his debt, if the establishment of servitude depreciates the value of the estate, or of causing the estate to be sold as free from all servitudes. If Mrs. Jeter, or her vendee, after she mortgaged the property to Widow Lelievre & Co., created servitudes on the properties, she, as a creditor, has the right to sell it as free from all servitudes. Mortgage is a quasi alienation. Citizens' Bank *v.* Armor, 11 An. 468.

But the plaintiff does not contend that there were servitudes on the lot No. three in favor of lots Nos. one and two ; she merely sets up that the three lots would sell better in block ; see her petition (1) ; that the whole properties were one. If so, then all servitudes were extinguished by confusion. C. C. 779.

## II.

IMPOSSIBILITY OF SELLING LOTS NOS. 1, 2 AND 3, IN A BLOCK, OWING TO THE CITIZENS' BANK STOCK MORTGAGE AND OTHER CONVENTIONAL MORTGAGES.

The plaintiff, in injunction, alleges that the judgment of Widow O. Lelievre & Co. is secured by special mortgage on property worth ten times the whole amount they claim ; (3) ; it was incumbent on her to prove it ; she did not even make any proof at all as to the value of these lots ; the *onus probandi* was on her, more especially as the defendant in injunction proved the enormous amounts of incumbrances on lots Nos. one and two. The very first conventional mortgage on the two last mentioned lots (not on No. three) was one in favor of the Citizens' Bank, to secure $31,500, interest and costs, in the capital stock of said bank, passed before Seghers, notary, eleventh February, 1837, (23), by Florance and Mrs. Jeter, who purchased from Florance, on the twenty-third February, 1853, (22, 23.) 2d. A special mortgage by Mrs. Jeter, to secure $16,350, interest and costs, per act notarial, thirtieth April, 1857. 3d. The special one granted by Mrs. Jeter, on the eleventh of March, 1859, to secure $13,500, interests and costs ; making a total of $61,350, without computing interest, which, if added to the above, would exceed one hundred thousand dollars. Now, plaintiff alleges that the three lots were worth ten times the amount due Widow O. Lelievre & Co. What is that amount ? Principal and interest, $7480. We see, then, by his own admission, that the three

lots were greatly under her own valuation, by much more than even forty thousand dollars.

But this is not all; she ignored that there were 421 shares, of one hundred dollars each, of the capital stock of the Citizens' Bank, secured by mortgage on these lots Nos. one and two alone. By section twenty-eight of the charter of this bank, all the properties mortgaged to said bank, as aforesaid, are preserved as a pledge for the final payment of the loan of twelve millions of dollars made by said corporation, until the final payment of all and every the bonds issued as aforesaid. The court knows, and is bound to take judicial cognizance of the fact, that only seven millions of these bonds were negotiated by the bank. The amount now due by the Citizens' Bank on her bonds is four millions four hundred and thirty-six thousand sixty-six dollars; and every foot of soil mortgaged to the bank, as aforesaid, is liable (including lots one and two) to secure the payment of these millions of dollars.

Would the court force us to advertise these three lots in a block, incurring costs? Now, how could the properties be sold in a block? Suppose the purchaser bid, at the sheriff's sale, a price for the whole, could you say what portion of the price he considered he had given for lot No. three? The ascertainment of this would be indispensable, so as to know what amount of the price should be apportioned to the extinguishment of the first special mortgage on lot No. three. What mode could be devised to figure it out? None. The law provides none.

## III.

### DE NON ALIENANDO PACTO.

In the act of mortgage by Mrs. Jeter to Widow O. Lelievre & Co., "she promises and binds herself not to sell, alienate, mortgage or incumber the same (the mortgaged properties) to the prejudice of the present act."

The purchaser and third possessor is not entitled to notice of the proceedings to enforce the mortgage containing the said pact. Smith v. Nettles, 13 An. 241; 8 An. 58; 9 Rob. 69, etc.

Mrs. Stinson, curatrix, was not a party to these proceedings; she had no right to interfere. The execution of the judgment and mortgage, according to the contract, was a matter solely against Mrs. Jeter; she alone could enjoin or interfere with the proceedings under the writ. The injunction, on this ground alone, should have been dismissed.

## IV.

### MILITARY AUTHORITY.

General Sheridan was in command of the Fifth Military District, under the reconstruction laws. He permitted lot No. three alone to be sold, and gave his authorization to the sheriff therefor. In Humphrey v. Brown, 19 An. 158, relating to a seizure of property under a fieri facias issued by a State court, it is laid down that the military order issued by him was paramount authority. In fact, he created judges, and by the section three of the act of Congress, 1866, "An Act to provide for the more efficient government of the rebel States," it was made his duty "to protect all persons in their rights of person and property, etc., and all interference under color of State authority, with the exercise of military authority under the act, shall be null and void."

## V.

PLAINTIFF NO INTEREST IN THE INJUNCTION; EVEN IF SHE HAD, DID NOT COMPLY WITH THE REQUISITES OF THE LAW.

Having shown the pretensions of plaintiff unfounded, in toto, need we say that she sued out the injunction only the day before the property was advertised to be sold. She had made no opposition to the advertisement or the appraisement, and took no action in court adverse to the proceedings of the sheriff. By article 649 C. P., the debtor loses the right of pointing out to the sheriff, if he allows the sheriff to execute the writ and advertise for sale the goods seized, without exercising the right, if she had any right, she thus waived it.

Her intention was merely to hinder and delay. Her husband purchased the property of Mrs. Jeter, but has never paid her, as we find in the certificate of mortgage that he granted a mortgage to his vendor to secure the enormous sum of $80,352 90 on the properties hereinbefore referred to. Can she even be termed a nominal party? No, an intermeddler, without the remotest possibility of its inuring to the benefit of any one. We further see a long list of judicial mortgages against her husband, amounting to $9,197 principal, add interest, which would be more than double the amount Mrs. Stinson even figures, as one of these debtors. See pages 19, 20, 21, filled with the recital of them.

Here arises an important matter as to these *judicial mortgages!* They could not be extinguished unless the Citizens' Bank, holding the first conventional mortgage, sold the lots one and two, on which alone stood this mortgage, which could alone rid the property of these mortgages. Widow Lelievre & Co., by selling the three lots in block, could not remove these incumbrances from the properties one and two. We humbly submit that the purchaser's title would be defective—no bid would have been made. This, then, is another *grave reason* why Widow Lelievre & Co. *could* not sell in block the three lots.

Judgment of this court can not be executed since the appeal was heard in this cause, (for it has been a long time under advisement) the Citizens' Bank has foreclosed her stock-mortgage, (the first conventional one), and the lots one and two were adjudicated to the said bank on the seventh day of September, 1868, for the sum of twenty-five thousand one hundred dollars. (See certified copies of these proceedings, annexed to this petition, and made a part hereof). It thus appears that the bank is the only party that is benefitted, and that other mortgaged creditors, whose mortgages by the fact of the sheriff's sale are extinguised, receive nothing, and the absolute title is now in the bank.

The judgment of this court, under any circumstances, is now impracticable.

Further, the appeal being only devolutive, Widow O. Lelievre & Co. have executed their judgment and foreclosed their mortgage on lot No. 3, and having purchased it, they have sold it to a third party. (See sale of sheriff and acts of sales hereunto annexed and made a part hereof).

The actual results prove conclusively that the positions we took and are still contending for, we humbly submit, were and are correct, and that the assertion we make, in saying that the plaintiff in injunction had not the remotest possibility of an interest in the sales of the properties, as above demonstrated.

The enormous mortgages on the lots one and two made it an evident impossibility for Widow O. Lelievre & Co. to sell the property in block. There was only one course to be pursued on their part; otherwise it would be a forfeiture of their rights under their first mortgage on lot

No. one. According to the law of the contract, they exercised their rights; any other construction, we submit, impairs the obligation of contracts.

As will be seen in the proceedings of foreclosure, Mrs. Stinson, through her attorney, on the twenty-fifth of February, 1868, made the following agreement: "Please stay execution for sixty days, and if Mrs. Stinson has not then satisfied the bank, you will continue the proceedings to sell the Florance Verandah Hotel." (18.) Is this not a ratification of the sale of lots No. one and two of the lot No. one, and consequently an abandonment of the appeal herein? If correct, this court should dismiss this appeal. The agreement then, also, that Mrs. Stinson could not even satisfy the first mortgage on lots Nos. one and two. We would suggest that in questions as to the mode of execution of a judgment, the ruling of a lower court should not be interfered with, unless clearly erroneous.

Rehearing refused.